UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AD LIGHTNING INC.,

                          Plaintiff,

           -v-

CLEAN.IO, INC.,

                         Defendant.

19-CV-7367 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Ad Lightning Inc. brings suit against Clean.io, Inc. ("Clean"), arguing that Clean misappropriated its trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and Washington's Uniform Trade Secrets Act, Revised Code of Washington § 19.108 *et seq.* Clean has moved to dismiss the complaint for failure to state a claim. For the reasons that follow, the motion is granted.

**I.    Background**

The following facts, drawn from the complaint, are presumed true for the purpose of this motion. (*See* Dkt. No. 1 ("Compl.").)

Plaintiff Ad Lightning Inc. is a technology company that helps customers weed out suspicious advertisements on their websites. (Compl. at 1 ¶ 1.[1]) From August to November 2017, Ad Lightning participated in an accelerator program run by the advertising agency R/GA. (Compl. at 4 ¶¶ 7, 8.) The accelerator program was funded by Oath, Inc., now Verizon Media, which was separately testing Ad Lightning's technology as a prospective client. (Compl. at 4 ¶¶ 9, 10.)

---

[1] The paragraph numbers in the complaint restart after certain section breaks, so for clarity the Court will cite references to the complaint by both page and paragraph number.

On October 19, 2017, Oath emailed Ad Lightning to terminate their ongoing licensing negotiations. (Compl. at 5 ¶ 15.) In the email, Oath claimed that it already had access to two Yahoo! products that performed similar functions. (Compl. at 5 ¶ 16.). Oath is a subsidiary of Verizon Communications, which had acquired Yahoo! earlier that year. (*Id.*)

Eight days later, Defendant Clean was formed. (Compl. at 5 ¶ 18.) Like Ad Lightning, Clean helps protect businesses from malicious online advertisements. (Compl. at 5 ¶ 19.) Clean's current CEO, Matt Gillis, was previously Oath's senior vice president of publisher platforms, and two of the company's other executives also worked for Oath "up to the summer of 2017." (Compl. at 5 ¶¶ 20, 21.)

In 2019, Ad Lightning filed this action against Clean, alleging that the company misappropriated Ad Lightning's trade secrets and proprietary information to start its business. (Compl. at 6-7 ¶¶ 27-39.) Ad Lightning seeks damages and injunctive relief to stop Clean from using its trade secrets, as well as fees and costs. (Compl. at 8 ¶¶ 3-6.) Clean has filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 12.)

**II.     Legal Standard**

A plaintiff facing a motion to dismiss under Rule 12(b)(6) must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need not contain "detailed factual allegations," but it must offer something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "[N]aked assertion[s]" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557). Nor will "a formulaic recitation of the elements of a cause of action." *Id.* (quoting *Twombly*, 550 U.S. at 555).

Instead, a plaintiff must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This requires more than the "sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Put simply, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

### III. Discussion

"To state a claim for misappropriation under the DTSA, a plaintiff must allege that it possessed a trade secret that the defendant misappropriated." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citing 18 U.S.C. § 1836(b)(1)). Clean argues both that Ad Lightning has insufficiently alleged that it possessed a trade secret and that there are no alleged facts supporting a claim of misappropriation. The Court addresses each claim in turn.

#### A. Possession of Trade Secrets

Under the DTSA, a trade secret is "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible," provided that the owner "has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential," from its secrecy. *Id.* § 1839(3). To survive a motion to dismiss, a party "has no obligation to reveal those secrets in the [c]omplaint simply to prove that they exist." *Island Intellectual Prop., LLC v. StoneCastle Asset Mgmt. LLC*, No. 19-CV-4792, 2020 WL 2793000, at *7 (S.D.N.Y. May 29, 2020) (internal quotations omitted). But that does not mean a party can get away with "nebulous" descriptions at the "highest level of generality." *Id.* Instead, "a party alleging that it owns a trade secret must put forth specific allegations as to the information owned," such that the opposing party is given

3

fair notice of the claim.  *Id.* (citing *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018)).

Clean argues — not unfairly — that Ad Lightning's complaint lacks the requisite specificity.  (Dkt. No. 14 at 10-11.)  At times, it is true, Ad Lightning's complaint does little more than parrot back the DTSA's definition of trade secret.  (*See, e.g.*, Compl. at 2-3 ¶ 1.)  Viewed as a whole, however, Ad Lightning's allegations include just enough information to put Clean on notice of the claim.  Ad Lightning explains, for example, that its proprietary information "combines synthetic audiences with live log-level user data to watch its clients' ad inventories around the clock, looking for bad ads, suspicious behavior, and compliance violations."  (Compl. at 3 ¶ 2.)  Ad Lightning also alleges that its program "includes a reporting function that allows its publisher clients to send reports of bad ads directly to the suppliers who sent them, thereby enabling the suppliers to remove the bad ads moving forward."  (*Id.*)

Ad Lightning is helped by the fact that courts have "accepted relatively general descriptions of alleged secrets at the motion to dismiss stage."  *Island Intellectual Prop., LLC*, No. 19-CV-4792, 2020 WL 2793000, at *7.  In one case, for example, the description of a trade secret as "technical data, internal pricing information, work product, research, [and] engineering designs" was held to be sufficiently specific.  *Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17-CV-5966, 2017 WL 6507110, at *9 (S.D.N.Y. Dec. 18, 2017); *see also Sorias v. National Cellular USA, Inc.*, 124 F. Supp. 3d 244, 259 (2015) (finding "data and designs of a specific phone charger with horizontally folding A/C prongs" enough to identify the trade secrets at issue); *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789-90 (S.D.N.Y. 2008) (same with respect to description of trade secret as "manufacturing cost details, drawings, test data, and other information about the design and manufacturing process for its dental

4

protectors"). In light of the kinds of descriptions courts have seen fit to accept, Ad Lightning's allegations clear the bar — if only just.

In addition to describing the trade secret with sufficient particularity, the owner must have "taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A). Such measures can include "the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality." *Mastercraft Decorators, Inc. v. Orlando*, 356 F. Supp. 3d 259, 271 (W.D.N.Y. 2018) (citation omitted). Ad Lightning appears to have taken such measures to protect its trade secrets, for example by requiring employees and clients to sign non-disclosure agreements. (Compl. at 3 ¶ 5.) Ad Lightning alleges that its proprietary information was "accessible only to parties with permission to view such information, and only after they have agreed to contracts that include strict confidentiality provisions that require them not to use or disclose this information." (Compl. at 6 ¶ 30.) These allegations, together with Ad Lightning's claim that the secrecy of its ad-monitoring processes and software help it "maintain its competitive advantage in the market" (Compl. at 6 ¶ 29), suffice to meet the first prong of the DTSA test.

### B.     Misappropriation

It is at the second prong, though, that Ad Lightning falters. As defined by the DTSA, misappropriation is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[, or] disclosure or use of a trade secret of another without express or implied consent by a person who … used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5). "The DTSA, therefore, contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *Integro USA,*

*Inc. v. Crain*, No. 19-CV-8752, 2019 WL 6030100, at *2 (S.D.N.Y. Nov. 14, 2019) (internal quotation marks and citation omitted).

Yet in support of its misappropriation claim, Ad Lightning does little more than offer circumstantial datapoints — enough to make its allegations possible, but not plausible. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557). Take, for example, one piece of evidence Ad Lightning marshals to allege impropriety at Oath. During the period in which Oath was testing Ad Lightning's programs, "Oath never activated the reporting function of Ad Lightning's Proprietary Information," which Ad Lightning takes as proof that Oath was "never genuinely testing the product's quality in anticipation for possible licensing but [was] instead only examining the product to study and misappropriate the trade secrets embodied in it." (Compl. at 5 ¶ 17.). But the fact that Oath failed to activate the reporting function might have owed to a variety of factors — inadvertent oversight, for example, or a realization that it did not need to test that function because it could get the same capabilities from another source. The idea that Oath must have been studying the product to steal its trade secrets is nothing more than conclusory, especially since Ad Lightning alleges no concrete link between the Oath employees testing the product and the people who went on to found Clean.

Ad Lightning's other allegations are equally conclusory. Ad Lightning makes much of the fact that Clean was formed just eight days after Oath terminated licensing negotiations with Ad Lightning, and that three of Clean's current executives used to work at Oath. (Compl. at 5-6 ¶¶ 18, 20-23.). But these facts are merely circumstantial. Beyond alleging that the three former Oath employees "had access to all of Ad Lightning's information through the accelerator program" (Compl. at 5 ¶ 22), Ad Lightning alleges no facts to suggest that the employees

actually acquired the information through improper means.[2] *See Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 674-75 (S.D.N.Y. 2016) (dismissing claim that a defendant "conspired to steal the Stolen Trade Secrets" and "effected the scheme through [another party]" as conclusory).

Finally, Ad Lightning alleges that "Yahoo! does not have the same products as Ad Lightning, as was previously alleged by Oath to be the reason why the 2017 negotiations between Ad Lightning and Oath fell through," concluding that "[t]he only reasonable and logical explanation for these facts . . . is that Clean Creative was founded on the illegal actions of individuals who misappropriated Ad Lightning's Propriety Information." (Compl. at 6 ¶¶ 25-26.) Yet there is an equally reasonable explanation: that Clean's founders had already been in the process of developing a similar ad-monitoring software on their own. As it stands, Ad Lightning's allegations are "merely consistent with" Clean's liability. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). *Twombly* and *Iqbal* require more.

Absent facts that give rise to the plausible inference that Clean misappropriated Ad Lightning's trade secrets, Ad Lightning's DTSA claim must be dismissed.

### C. Other Claims

Ad Lightning also brings a claim under Washington's Uniform Trade Secrets Act. But since Ad Lightning's federal claim is dismissed, the Court declines supplemental jurisdiction over this state-law claim. *See* 28 U.S.C. § 1367(c)(3). As the Supreme Court has held, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law

---

[2] There is some confusion in the complaint as to the scope of the non-disclosure agreement Ad Lightning signed with R/GA — in particular, whether it included Oath and its employees — but even assuming *arguendo* that it did, Ad Lightning still does not do enough to allege that Clean's executives violated the agreement by stealing the trade secrets at issue.

claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Pursuant to § 1367(c)(3), the Court thus declines such jurisdiction here.

### D. Leave to Amend

In its reply brief, Ad Lightning requests leave to amend if the Court finds its factual allegations insufficient.  In deciding whether to grant leave to amend, the Second Circuit directs courts to "hew to the liberal standard set forth in Rule 15, which states that '[t]he court should freely give leave [to amend] where justice so requires.'"  *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (quoting Fed. R. Civ. P. 15(a)(2)).  There is a "strong preference for resolving disputes on the merits."  *Id.* (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.").

Accordingly, Ad Lightning — if it still wishes to amend its complaint — is directed to file a letter motion explaining how a second amended complaint would state a claim consistent with this Opinion and Order, for example by identifying additional facts that would show that Clean misappropriated the trade secrets at issue.  Ad Lightning is further directed to append to the letter a draft of the proposed second amended complaint indicating the changes from the current operative one.  If Ad Lightning chooses to file such a letter motion, it must do so on or before August 27, 2020.

## IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.

Plaintiff may file a letter motion requesting leave to file a second amended complaint, provided that it does so on or before August 27, 2020.  If Ad Lightning chooses not to seek leave to amend, it is directed to so indicate in a letter filed by the same date.  If Plaintiff chooses not to

amend, or does not file a letter within the indicated time limit, the Court will enter final judgment and direct the Clerk of Court to close this case, permitting an appeal.

The Clerk of Court is directed to close the motion at Docket Number 12.

SO ORDERED.

Dated: August 7, 2020
New York, New York

_____
J. PAUL OETKEN
United States District Judge

9