

John Du Wors
Direct   +206.274.2834
Main    +206.274.2800
john@newmanlaw.com

2101 Fourth Avenue, Suite 1500
Seattle, WA 98121

**SUBMITTED VIA ECF**

August 27, 2020

Hon. J. Paul Oetken
U.S. District Court, Southern District of New York
40 Foley Square
New York, NY 10007

      Re:   *Ad Lightning Inc. v. Clean.io, Inc.*
              **Case No. 1:19-cv-07367-JPO**

Dear Judge Oetken,

We represent Ad Lightning, Inc., and write to request permission to file a first amended complaint. Ad Lightning alleges Defendants misappropriated trade secrets. On August 7, 2020, the Court dismissing the complaint and allowed a letter motion requesting leave to amend. The Court found that Ad Lightning's complaint adequately alleged the existence of trade secrets but failed to allege sufficient facts supporting Ad Lightning's conclusion that Defendants misappropriated them.

We seek to add additional detail. Specifically, in addition to the facts already pled, Ad Lightning will plead that it offers its clients proprietary software called an "ad wrapper" that accompanies digital advertisements and protects against malicious code. Digital advertisements are created by advertisers and can be placed on websites or other internet resources. When a consumer clicks on a digital advertisement, the consumer is transited to the advertiser's website. Digital advertisements can carry malicious software code, either placed by unscrupulous advertisers or third parties. That malicious code can harm the website the ad is placed on, harm the user's computer who clicks on it, misdirect the internet traffic, or cause other harm. Ad Lightning's ad wrapper accompanies an ad and checks it for malicious code by evaluating features within the ad code and comparing those features to a proprietary "blacklist" of known harmful domain names and other items.

Both Ad Lightning's ad wrapper code and the blacklist are closely-guarded trade secrets. Ad Lightning created the wrapper by writing the code. Ad Lightning created the blacklist by testing millions of advertisements in a controlled environment, where harmful code could not function but could be detected. Ad Lightning does not release its blacklist or its ad wrapper code and carefully screens them so they cannot be viewed without reverse engineering.

Defendants had access to both Ad Lightning's ad wrapper code and the blacklist while the parties worked together on a joint venture. After leaving the joint venture, Defendants created a product that had identical features to Ad Lightning's ad wrapper product. Defendants falsely claimed that their product used different techniques. But in truth, when Ad Lightning reviewed Defendants'

*Hon. J. Paul Oetken*
*August 27, 2020*
*Page 2 of 2*

competing product, Ad Lightning discovered that the competing product used ad wrapper code to apply a blacklist just like Ad Lightning's product did. And although Ad Lightning could not view the code—but will be able to do so with discovery—Ad Lightning was able to view the blacklist and discovered that it contained seven items, 5 of which were identical to items on Ad Lightning's blacklist.

Ad Lightning's complaint already contains allegations bolstering this discovery and suggesting that Defendants intentionally accessed Ad Lightning's product in order to copy it, including that Defendants obtained a copy of Ad Lightning's product allegedly to test it but never activated a key feature, lied about the reason for leaving the joint venture, formed their competing company just eight days after leaving the joint venture, and have key former Ad Lightning employees at the helm. Ad Lighting thus alleges that Defendants misappropriated Ad Lightning's trade-secret protected blacklist because data from it was found on Defendants' competing product, and on information and belief that Defendants also misappropriated Ad Lightning's ad wrapper code because Defendants' product functions identically even though Defendants falsely claimed that they used different techniques.

We accordingly seek leave to amend the complaint to add these supplemental allegations.

Best regards,

NEWMAN DU WORS LLP

John Du Wors

Enclosure

cc:     Marc J. Rachman, Counsel for Defendant (via ECF)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AD LIGHTNING INC., a Delaware corporation,<br><br>      Plaintiff,<br><br>      v.<br><br>CLEAN.IO, INC., a Delaware corporation,<br><br>      Defendant. | Case No. 1:19-cv-7367<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Under 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1836 *et seq.* (Defend Trade Secrets Act of 2016), Plaintiff Ad Lightning Inc. alleges for its complaint against Defendant Clean.io, Inc., on personal information as to Ad Lightning's own activities, and upon information and belief as to the activities of others, as follows:

**INTRODUCTION**

1. At its core, this case is very straightforward: Clean.io, Inc. ("Clean Creative"), through its founders, engineers and executive team, has misappropriated Ad Lightning Inc.'s trade secrets and proprietary information. Ad Lightning's proprietary information provides its customers—who are operators of websites that publish online media content and generate revenues from selling online advertisement space—with novel, innovative technology that monitors electronic advertisements for suspicious behavior and compliance violations to identify bad ads. Its technology tracks these bad ads to the source and blocks those that don't belong on the website. Ad Lightning has invested millions of dollars to build and develop its proprietary information. Subject to a non-disclosure agreement, Ad Lightning engaged in negotiations with entities that previously employed Clean Creatives founders for the purpose of licensing its proprietary information to those entities. During negotiations and a trial use of the proprietary information, those entities' employees stole Ad Lightning's proprietary information to found Clean Creative. As if almost overnight—and only one week after negotiations abruptly ended—Clean Creative popped up as a competitor to Ad Lightning, providing the exact same technology

and services. The connections between Clean Creative's executive board and Ad Lightning, combined with the timeline within which Clean Creative emerged after Ad Lightning's negotiations fell through are not coincidence. Clean Creative has misappropriated Ad Lightning's proprietary information and now benefits from it, at the expense of Ad Lightning.

## JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case presents a federal question under the trade-secret laws of the United States, 18 U.S.C. § 1836 *et seq*. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because they are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3. This Court has personal jurisdiction over Defendant Clean Creative because Clean Creative has offices in New York, through which it has a systemic and continuous course of doing business in New York such that Clean Creative is subject to general jurisdiction in New York.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because Clean Creative is subject to this Court's personal jurisdiction as a result of engaging in a systemic and continuous course of doing business in New York. Also, substantial portions of the evidence and witnesses involved in this case are located in New York.

## PARTIES

5. Plaintiff Ad Lightning Inc. is a Delaware Corporation qualified to do business in New York and Washington with a principal place of business in Seattle, Washington.

6. Defendant Clean.io, Inc. is a Delaware corporation qualified to do business in New York with a principal place of business in Baltimore, Maryland.

## FACTUAL ALLEGATIONS

**A. Ad Lightning's business depends on its proprietary information that tracks and eliminates bad ads.**

1. Plaintiff Ad Lighting has invested millions of dollars in the research and development of its technology and proprietary system (the "Proprietary Information"). As a result, Ad

2
FIRST AMENDED COMPLAINT FOR DAMAGES

Lightning has created a set of confidential business, scientific, technical, economic, and engineering information—including patterns, plans, compilations, program devices, formulas, designs, prototypes, specifications, methods, techniques, capabilities, processes, procedures, programs, and codes—which Ad Lightning has taken many cautious and protective measures to keep secret.

2. Digital advertisements are created by advertisers and can be placed on websites or other internet resources. When a consumer clicks on a digital advertisement, the consumer is transited to the advertiser's website. Digital advertisements can carry malicious software code, either placed by unscrupulous advertisers or by third parties. That malicious code can harm the website the ad is placed on, harm the user's computer who clicks on it, misdirect the internet traffic, or cause other harm.

2.3. Ad Lightning's Proprietary Information protects its customers from problematic online advertisements and provides them with network insights to take control of their online programmatic advertising. It combines synthetic audiences with live log-level user data to watch its clients' ad inventories around the clock, looking for bad ads, suspicious behavior, and compliance violations. With real-time automated alerts and reports and proactive ad blocking, Ad Lightning's Proprietary Information, comprising comprehensive ad quality tools, tracks bad ads to the source and blocks the ones that don't belong on the client's websites. Its analytical tools empower clients to enhance their ecosystem partnerships, provides new ways to assess traffic quality, and helps maximize return on investments. Specifically, Ad Lightning offers its customers proprietary software called an ad wrapper. The ad wrapper either runs on the customer's system or accompanies an ad and checks the ad for malicious code by evaluating features within the ad code and comparing those features to a proprietary "blacklist" of known harmful domain names and other items.

4. Ad Lightning created the wrapper by writing the code. Ad Lightning created the blacklist by testing millions of advertisements in a controlled environment, where harmful code could not function but could be detected. Ad Lightning currently tests over one million advertisements per day and has tested millions of ads overall. The blacklist contains an extensive

list of harmful and potentially harmful items.

3.5.   Of significance, the Proprietary Information includes a reporting function that allows its publisher clients to send reports of bad ads directly to the suppliers who sent them, thereby enabling the suppliers to remove the bad ads moving forward.

4.6.   Overall, Ad Lightning's Proprietary Information benefits consumers with a better user experience, improves the reputations of publishers and exchanges, improves their relationships, and reduces significant costs associated with the bad ads.

5.7.   The value of Ad Lightning's proprietary information is related to and dependent upon its proprietary and non-public nature. Ad Lightning takes many steps to protect the security of it. Exemplary of this is the non-disclosure agreement Ad Lightning requires all of its employees and clients to sign. Ad Lightning further encrypts its ad wrapper software as well as the blacklist. It is impossible to view the software or blacklist without reverse engineering.

**B.   As part of R/GA's accelerator program, Ad Lightning disclosed its information to R/GA, Oath, and Verizon under a Non-Disclosure Agreement.**

6.8.   In July 2017—following discussions that began in May 2017—Ad Lightning executed a Non-Disclosure Agreement (the "NDA") with R/GA Ventures VI ("R/GA") for the purpose of enrolling in a technology accelerator program (the "Accelerator Program").

7.9.   The Accelerator Program was organized and administered by R/GA, which is a large advertising agency.

8.10.   In August 2017, Ad Lightning became a member of the Accelerator Program. The Accelerator Program ran through November 9, 2017.

9.11.   R/GA's Accelerator Program was funded by Oath, Inc. ("Oath") for whom R/GA worked. Oath has been a 100% subsidiary of Verizon Communications ("Verizon") since at least May 2017. In January 2019, Oath changed its name to Verizon Media.

10.12.   Ad Lightning became a member of the Accelerator Program largely in part because it was in negotiations with Oath. Oath was testing Ad Lightning's Proprietary Information and technology with the aim of licensing them from Ad Lightning at the end of the Accelerator Program.

~~11.~~13.  Ad Lightning was aware of the business relationship between R/GA and Oath. Through the interchanging communications with R/GA, Oath, and Verizon, along with Oath and Verizon's significant involvement in the Accelerator Program, all parties understood that the NDA covered not only R/GA but also Oath and Verizon.

C. **As part of the Accelerator Program, and facilitated by the NDA, Oath had access to all of Ad Lightning's Proprietary Information.**

~~12.~~14.  As a result of Ad Lightning becoming a member of the Accelerator Program, R/GA, Oath, and Verizon had full access to all of Ad Lightning's information, including the Proprietary Information.

~~13.~~15.  Additionally, Oath was given complete access to the Proprietary Information because it was considering licensing Ad Lightning's products.

~~14.~~16.  As a result, Oath and Verizon were third-party beneficiaries of the NDA through R/GA, which merely served in an administrative role for the Accelerator Program. And Ad Lightning was correspondingly a third-party beneficiary of the NDA's executed by Oath and Verizon as part of their participation in the program.

~~15.~~17.  On October 19, 2017, after having received only positive feedback from Oath, Oath emailed Ad Lightning stating that Oath was terminating its licensing negotiations with Ad Lightning.

~~16.~~18.  In the October 19 email, Oath stated that it was resorting to the use of two Yahoo! products that performed exactly the same services as Ad Lightning. Oath claimed that, as part of Verizon, it had access to Yahoo!'s products as because Verizon acquired Yahoo!.

~~17.~~19.  Of significance is the fact that during the trial period, Oath never activated the reporting function of Ad Lightning's Proprietary Information. This is significant because the reporting capability was a very valuable function and one that set Ad Lightning apart from the competition. Enabling the reporting function would have generated both proof of value and Oath's awareness of its value. Oath's decision not to activate that functionality indicates they were never genuinely testing the product's quality in anticipation for possible licensing but were instead only examining the product to study and misappropriate the trade secrets embodied in it.

**D.  A week after Oath unexpectedly quit negotiations with Ad Lightning, Clean Creative was formed.**

~~18.~~20. On October 27, 2017—only eight days after Oath terminated negotiations with Ad Lightning—Defendant Clean.io, Inc. ("Clean Creative") was formed.

~~19.~~21. Clean Creative provides the exact same services using the exact same technology as Ad Lightning: protecting business from malicious online advertisements and providing them with network insights to take control of their online programmatic advertising.

~~20.~~22. Two of Clean Creative's current executives, Jay Crystal and Seth Dempsey, were previously employed by Oath or one of its predecessors for a period of time up to the summer of 2017.

~~21.~~23. From June 2017 to August 2018, Matt Gillis was the senior vice president of publisher platforms at Oath. Since January 2019, Matt Gillis has been the CEO of Clean Creative.

~~22.~~24. While at Oath, Crystal, Dempsey, and Gillis had access to all of Ad Lightning's information through the Accelerator Program, including the Proprietary Information.

~~23.~~25. As Oath and/or Verizon employees, Crystal, Dempsey, and Gillis each were under an obligation, via NDA and applicable law, to not disclose, use, or misappropriate the Proprietary Information.

**E.  Oath and Verizon employees stole Ad Lightning's trade secrets to start Clean Creative, a competing company.**

~~24.~~26. Clean Creative's employees stole Ad Lightning's information, including the Proprietary Information, for the purpose of starting the competing venture Clean Creative.

~~25.~~27. Through its recent April 2019 discussions with Verizon, Ad Lightning has learned that Yahoo! does not have the same products as Ad Lightning, as was previously alleged by Oath to be the reason why the 2017 negotiations between Ad Lightning and Oath fell through.

28.  Clean Creative created and marketed a competing product. Clean Creative claimed its product did not use a blacklist, but instead relied on alternate techniques.

29.  Ad Lightning obtained a copy of Clean Creative's competing product when Ad Lightning screened a digital advertisement and discovered Clean Creative's ad wrapper was

attached to it. Contrary to Clean Creative's marketing claims, Clean Creative's product had an associated blacklist of seven items. Clean Creative's software was encrypted and Ad Lightning could not view it, but the blacklist was not encrypted and Ad Lighting could view the items on it. Five of the items on Clean Creative's blacklist were also on Ad Lightning's blacklist. The items were not readily identifiable as malicious. For example, one of the items was the domain <d22nv8evmr3d8f.cloudfront.net>, which Ad Lightning identified only by discovering it led to a potentially malicious website while testing millions of ads.

26.30. The only reasonable and logical explanation for these facts this is that Clean Creative was founded on the illegal actions of individuals who misappropriated Ad Lightning's Proprietary Information to found Clean Creative.

**FIRST CAUSE OF ACTION**

Misappropriation of Trade Secrets under 18 U.S.C. § 1836(b) and Revised Code of Washington § 19.108 *et seq*.

27.31. Ad Lightning incorporates the allegations set forth in paragraphs 1 through 26 as though fully set forth herein.

28.32. Ad Lightning is the owner of certain valuable, confidential, and proprietary information, such as the Proprietary Information, including but not limited to ad-monitoring processes, techniques, models, and software. This information derives value from not being generally known to the public or Ad Lightning's competitors.

29.33. This information constitutes trade secrets that enable Ad Lightning to conduct its business, serve its customers, and maintain its competitive advantage in the market.

30.34. Ad Lightning keeps this information secret; it is accessible only to parties with permission to view such information, and only after they have agreed to contracts that include strict confidentiality provisions that require them not to use or disclose this information. Should these trade secrets be accessible to individuals or businesses outside of Ad Lightning, they could be used to economically harm Ad Lightning and enrich the possessor.

31.35. Ad Lightning disclosed and provided complete access to its trade secret information to R/GA, Oath, and Verizon under a non-disclosure agreement.

32.36. R/GA, Oath, and Verizon employees had access to Ad Lightning's trade secret information by virtue of this relationship.

33.37. Relying on the confidential, sensitive, and proprietary information gained during the Accelerator Program, Oath and Verizon employees misappropriated Ad Lightning's trade secret information to found a directly-competing business, Clean Creative.

34.38. In so doing, Clean Creative used improper means to acquire Ad Lightning's trade secret information. Clean Creative knew or had reason to know at the time it obtained and used Ad Lightning's trade secret information, that such information was obtained from persons or entities owning Ad Lightning a duty to maintain the secrecy thereof.

35.39. Clean Creative has misappropriated, and will likely continue to misappropriate, Ad Lightning's trade secrets by using these trade secrets without authority to commercially deploy its directly competing software product and to attempt to solicit current and prospective customers away from Ad Lightning.

36.40. As a direct and proximate result of Clean Creative's current and continued misappropriation of Ad Lightning's trade secrets, Ad Lightning will suffer imminent and irreparable harm.

37.41. Unless enjoined by this Court, Clean Creative's acts of misappropriation will continue, and Ad Lightning will continue to suffer irreparable harm.

38.42. Ad Lightning requests that this Court enjoin Clean Creative from using any trade secret information obtained from Ad Lightning in any way.

39.43. Clean Creative's current and continued misappropriation of Ad Lightning's trade secrets is reckless and malicious. It knows of the confidentiality, ownership, and use restrictions on these trade secrets. Therefore, Ad Lightning is entitled to an award of exemplary damages and its reasonable attorney fees.

**PRAYER FOR RELIEF**

Wherefore, Ad Lightning respectfully requests the Court grant damages and other relief against Defendant, and judgment as follows:

1. Entry of judgment in its favor and against Clean Creative on all accounts;

2. Entry of judgment in its favor against Clean Creative on its Claim for Relief that Clean Creative's unlawful conduct was willful and knowing;

3. As to its First Claim for Relief, its actual damages and unjust enrichment or a reasonable royalty, in an amount to be proven at trial, exemplary damages, and its reasonable attorney fees;

4. Exemplary damages for Clean Creative's willful and knowing misappropriation of trade secrets;

5. Immediate and permanent injunctive relief prohibiting Clean Creative from using Ad Lightning's trade secrets;

6. An award of Ad Lightning's costs of suit, including the costs of experts and reasonable attorneys' fees as permitted by law, for example, pursuant to 18 U.S.C. § 1836 *et seq.* and RCW 19.108;

7. An award of pre- and post-judgment interest; and

8. Such other relief as the Court may deem just and equitable.

## JURY DEMAND

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues presented in this Complaint which are so triable.

Dated: August 27, 2020

Respectfully submitted,

NEWMAN DU WORS LLP

_____

John Du Wors, State Bar No. 5047048
2101 Fourth Avenue, Suite 1500
Seattle, WA 98121
Telephone:            (206) 274-2800
Facsimile:            (206) 274-2801
Email:            *john@newmanlaw.com*

Counsel for Plaintiff
Ad Lightning Inc.